571 So.2d 130 (1990)
Janet FRICKE and George Fricke, Jr.
v.
OWENS-CORNING FIBERGLAS CORPORATION, et al.
Darryl FRICKE, Individually and as the Natural Tutrix of the Minor Child Glen Henry Fricke
v.
OWENS-CORNING FIBERGLAS CORPORATION, et al.
Keith DAVILLIER, et al.
v.
BAUMER FOODS, INC., et al.
No. 90-C-0816.
Supreme Court of Louisiana.
December 3, 1990.
*131 Jerome M. Volk, Jr., Mark J. Armato, Kenner, for Baumer Foods Inc., Alvin A. Baumer and Roger Baumer, defendants-applicants.
Sidney L. Shushan, William J. Guste, III, Joseph B. Landry, Guste, Barnett & Shushan, New Orleans, for Janet Fricke and George Fricke, Jr., plaintiffs-appellants.
Theodore A. Mars, Jr., New Orleans, for Darryl Fricke, plaintiff-appellant.
Bruce C. Waltzer, Michael G. Bagneris, Waltzer & Bagneris, New Orleans, for Keith Davillier, Heath Davillier, and Melvin Davillier, Jr., plaintiffs-appellants.
Jerome M. Volk, Jr., DeMartini, LeBlanc, D'Aquila & Volk, Kenner, for Baumer Foods, et al., defendant-appellee.
DENNIS, Justice.
In these actions, the plaintiffs seek to recover damages for intentional torts as the result of the death of one employee and the brain damage of a second which allegedly occurred when an employer's plant superintendent knowingly exposed the employees to the inhalation of toxic mustard vapors. The trial court granted defendants' motion for summary judgment, but the court of appeal reversed. Fricke v. Owens-Corning Fiberglas, 559 So.2d 24 (La.App. 4th Cir.1990). We reverse the court of appeal's judgment.
George Fricke, III, the 30 year old foreman of the mustard mill unit at Baumer Foods, Inc., looked down into an 18 foot deep mustard tank and saw Melvin Davillier, Sr. a fellow employee, lying unconscious at the bottom. He immediately fetched Roger Baumer, the 76 year old plant superintendent. Baumer started to descend a rope ladder inside the tank to rescue Davillier, but Fricke persuaded the older man to let him go instead. Baumer testified at his deposition as follows:
Q. Going back up to the point in time when you and George [Fricke] arrived at the top of the catwalk and you looked into the tank and you saw Melvin [Davillier]
A. Right.
Q. Just tell me what happened next without going into the whole story. I'd like to try to break it down into question and answer.
A. I said I'll go down and get him [Davillier]. So I stepped over into the tank. I had one foot down on the ladder, and George said wait a minute. In other words, I looked like I was taking too long to get in there. George said I'm lighter than you. Let me go. And I said well, I'll go get a rope to pull him up.
Baumer's testimony is undisputed in the record presented for our review.
During Fricke's descent Baumer went for a rope and other employees to assist in the rescue. When they returned Fricke was prostrate at the bottom of the tank *132 beside Davillier. A rescue unit of the fire department was summoned. Baumer employees and the firemen forced an opening in the tank wall and removed the men. Tragically, however, Davillier had suffered injuries which would later prove to be fatal and Fricke had sustained severe brain damage. Several actions ensued.
The first action was instituted by Darryl Fricke (wife of George Fricke, III) individually and as the natural tutrix of Glen Henry Fricke (son of George Fricke, III). The second action was instituted by Janet Fricke and George Fricke, Jr. as curators for their injured son, George Fricke, III. The third action was instituted by Keith Davillier, as dative curator for Melvin Davillier, Sr. (the injured employee). Subsequent to the death of Melvin Davillier, Sr., his heirs, Keith Davillier, Heath Davillier and Melvin Davillier, Jr., were substituted as plaintiffs in this action. Various parties were made defendants in the suits including: the employer, Baumer Foods, Inc.; the alleged owners, Alvin Baumer, Sr. and Alvin Baumer, Jr.; and Roger Baumer. The three actions were consolidated in the trial court.
The four aforementioned Baumer defendants moved for summary judgment on the ground that these tort actions were barred by the exclusive remedy rule of the worker's compensation statute because there is no genuine issue as to the material facts; and that these facts reflect clearly that the accidental death and injury were due, at most, to the negligence of the superintendent rather than to his intentional act or tort. See La.R.S. 23:1032; Bazley v. Tortorich, 397 So.2d 475 (La.1981). The trial court granted summary judgment terminating each action without assigning reasons. The plaintiffs appealed, and the court of appeal reversed. Fricke v. Owens-Corning Fiberglas, 559 So.2d 24 (La.App. 4th Cir.1990). With respect to Fricke's injury the court concluded that a genuine issue of material fact exists as to whether Baumer's alleged act or omission in allowing Fricke to enter the tank to rescue Davillier was an intentional act or tort; therefore, summary judgment was improper. The court also reversed the trial court's summary judgment dismissing the Davillier action but failed to assign any reasons for its decision.
In this court the plaintiffs argue that Baumer's acts and omissions causing Fricke to go down into the mustard tank amounted to an intentional tort because: (a) Baumer desired to cause Fricke to come into harmful or offensive contact with the vapors in the mustard tank or believed that these consequences were substantially certain to result; and, (b) Baumer and his employer therefore are subject to liability for battery or other intentional tort because he acted intending to cause a harmful or offensive contact with Fricke's person and a harmful contact resulted. See Restatement (Second) of Torts, American Law Institute §§ 8A & 13 (1965); Bazely v. Tortorich, 397 So.2d 475 (La.1981). Plaintiffs correctly note that in order for Baumer to be liable it is not necessary that he intend to inflict actual damage or that his intention be malicious. It is sufficient if the actor intends to inflict either a harmful or offensive contact without the other's consent. Caudle v. Betts, 512 So.2d 389, 391 (La.1987); Karl J. Pizzalotto, M.D., Ltd. v. Wilson, 437 So.2d 859 (La.1983); Coppage v. Gamble, 324 So.2d 21 (La.App. 2d Cir.1975); F. Stone, Louisiana Civil Law Treatise, Tort Doctrine § 125 (1977). Moreover, they aptly observe that when a battery has been proved, the defendant's liability for the resulting harm extends, as in most other cases of intentional torts, to consequences which the defendant did not intend, and could not reasonably have foreseen, upon the obvious basis that it is better for unexpected losses to fall upon the intentional wrongdoer than upon the innocent victim. Caudle v. Betts, 512 So.2d at 392; W. Prosser and W. Keeton, The Law of Torts § 9 (5th ed. 1984); Restatement (Second) of Torts, American Law Institute § 16 (1965); 1 Harper, James and Gray, The Law of Torts § 3.3 (2d ed. 1986).
All intended wrongs, however, have in common the element that they are inflicted without the consent of the victim. 1 Harper, James and Gray, The Law of Torts *133 § 3.10, p. 298 (2d Ed.1986). Consent therefore ordinarily bars recovery for intentional interferences with person or property. It is a fundamental principle of the common law that volenti non fit injuria to one who is willing, no wrong is done. W. Prosser and W. Keeton, The Law of Torts § 18, p. 112 (5th ed. 1984). "The absence of lawful consent," said Justice Holmes, "is part of the definition of assault." Ford v. Ford, 143 Mass. 577, 578, 10 N.E. 474 (1887). As remarked by Patteson, J., "An assault must be an act done against the will of the party assaulted; and therefore it cannot be said that a party has been assaulted by his own permission." Christopherson v. Bare, 11 Q.B. 473, 116 Eng.Rep. 554, 556 (1848). See also Andrepont v. Naquin, 345 So.2d 1216, 1219 (La.App. 1st Cir.1977); Restatement (Second) of Torts, American Law Institute § 13 (1965); R. Dias and B. Markesinis, Tort Law 174 (1984); F. Stone, Louisiana Civil Law Treatise, Tort Doctrine § 131 (1977).
From our review of the summary judgment proceeding evidence, we conclude that there is no genuine dispute of material fact and that the defendants are entitled to judgment as a matter of law. In our opinion, based on the record presented, reasonable minds must inevitably conclude that Fricke consented to whatever offensive or harmful contact that Baumer desired or believed to a substantial certainty would befall Fricke when he descended to rescue Davillier. It is uncontroverted that neither Fricke nor Baumer knew that the mustard tank contained lethal or gravely damaging vapors; and that neither knew what had felled Davillier at the bottom. The evidence indicates without dispute that, although there had been some indication that the vapors had caused breathing difficulties to a few employees, in approximately 57 years of operations prior to the accident no employee had been rendered unconscious or seriously injured by the mustard tanks' vapors.[*]
Davillier's heirs have not filed a brief in this court. In the lower court proceedings, the Davilliers presented no evidence any different from that presented on behalf of the Frickes. Accordingly, we conclude that just as the court of appeal erred in reversing the trial court's dismissal of the Fricke actions, it also erred in reversing the trial court's dismissal of the Davillier action.
For the reasons assigned, the judgment of the court of appeal is reversed and the judgments of the trial court are reinstated.
REVERSED; SUMMARY JUDGMENTS REINSTATED AND AFFIRMED.
NOTES
[*] Of course, if Fricke in consenting to contact with the offensive vapors had been induced to do so by a substantial mistake as to the nature of the vapor or the extent of harm to be expected from it and the mistake had been known to Baumer or induced by Baumer's misrepresentation, Fricke's consent would not have been effective for the unexpected invasion or harm. See Restatement (Second) of Torts, American Law Institute § 892B (1965). However, there is nothing to indicate that Baumer had any greater knowledge of the danger than Fricke or that Baumer knew of or induced Fricke's mistake. In fact, the record is convincing beyond any reasonable doubt that both Fricke and Baumer reacted as normal, decent human beings faced with the unprecedented distress of a fellow worker in an unforeseen emergency.