PER CURIAM.
The issues are: 1) whether Tenneco, Inc. and Tenneco Oil Company can be sued for wrongful death under the intentional acts exclusion of the worker’s compensation law found in LSA-R.S. 23:1032, and 2) whether the award in favor of plaintiffs and against defendant Audrey E. Massey ($875,000.00) is too low. The trial court judgment dismissed any and all claims against Tenneco Oil Company, Tenneco, Inc., and two managers of the Tenneco Refinery in St. Bernard Parish, Albert Caldwell, Jr. and William E. Heck. The trial court found Audrey E. Massey liable in the amount of $875,000.00. Plaintiffs appeal. For the reasons assigned, the judgment is affirmed.

Facts

On January 8, 1980, the Oil, Chemical and Atomic Workers International Union and its Local 4,522 (“OCAW”) began a strike of the Tenneco Refinery in Chal-mette, Louisiana. The strikers set up picket lines and various acts of picket line misconduct began immediately: shots were fired, flares were fired, automobiles were damaged by nails scattered on the street, and persons were harassed and intimidated as they attempted to enter or exit the refinery.
On January 9, 1980, Tenneco filed a petition to enjoin all unlawful Union activities. OCAW and Tenneco entered into a consent decree which was signed by Judge Thomas McBride on the evening of January 9, 1980. The consent order limited the number of pickets, prohibited the use of both the Foster-Wheeler gate on Paris Road and the Broadmoor gate off of St. Bernard Highway by anyone other than those engaged in new capital construction, and enjoined any unlawful activity. Despite the consent decree, picket line misconduct continued.
On January 14, 1980, Tenneco filed further pleadings with the court asking for judicial relief and an immediate hearing. The court conducted a trial of the matter on January 15 and 16, 1980. Evidence presented by Tenneco included picket line harassment, shooting of flares and telephone disconnection. The Union alleged that Tenneco had violated the consent order by permitting its employees to enter the refinery via Contractor’s Road, an un-picketed entrance, thereby avoiding the Union’s informational pickets at the main gate on River Road.
After the injunctive pleadings were filed on January 14, 1980, there were no reports of picket line misconduct to Tenneco management. On January 17, 1980, Judge McBride rendered judgment limiting the number of pickets, setting forth specific entrances to the plant at which picketing would be permitted and ordering all other gates allowing access to the refinery closed and locked for the duration of the strike. *562 Because of the increasingly hostile situation at Tenneco, the trial judge also specified that any weapons or instrumentalities that could be used to inflict bodily harm could not be carried or displayed. Tenneco was ordered to refrain from stationing more guards than picketers and from arming its guards. The judgment further prohibited Tenneco, under penalty of contempt, from allowing anyone but capital construction personnel from using the Poster-Wheeler gate and the Tenneco construction gate on Contractor’s Road.
In order to ensure compliance with the court order, Tenneco managers A1 Caldwell, William Heck and Jerry Singletary decided to bar all access to Contractor’s Road by erecting a barricade across the road where it intersected Paris Road. The capital construction personnel would be required to enter the refinery at the Poster-Wheeler gate. It was decided that Jerry Singletary, manager of the Maintenance Department, would take responsibility for the barricade project. He instructed one of the maintenance personnel to construct a barricade on the evening of January 17, 1980 so that it could be placed early the next morning before the contractors began reporting for work.
On January 18, 1980, at approximately 6:00 a.m., Jerry Singletary met with the Maintenance personnel for a general meeting during which duties for the day were assigned. Singletary was informed at this time that the barricade had been constructed. Singletary made a general request for someone to assist him in installing the barricade. Bud Hurst, one of the Maintenance Department supervisors, replied that he would accompany Singletary as soon as he lined up work assignments for his group. Neither Caldwell nor Heck were present at this meeting and they did not know who would be assigned the duty of erecting and/or installing the barricade or whether Singletary would handle the task alone.
Hurst and Singletary loaded the barricade onto the back of a pickup truck and proceeded to exit the main gate toward Contractor’s Road. At the main gate, they stopped to inform the picketers of their intentions. The picketers were very friendly. Singletary and Hurst then drove down Paris Road to Contractor’s Road where they unloaded the barricade at approximately 7:00 a.m.
When he realized the barricade was too small, Bud Hurst went back to the plant facility to have another barricade constructed. Singletary remained on Contractor’s Road to insure that no unauthorized vehicles entered the Refinery. Singletary testified that he did not feel concerned for his safety, nor did Mr. Hurst.
While Singletary was waiting for Mr. Hurst to return, he noticed that traffic was building up on Paris Road as the construction crew began arriving and the ferry unloaded. Singletary observed two near-rearend collisions and a number of vehicles driving on the shoulder of the road. The slow processing of contractors by the security guard and the discharge of ferry traffic added to the traffic jam at Paris Road. Singletary decided to speed up the identification process at the Foster-Wheeler gate. On the way, Singletary eneoun-. tered Jill Tagliavore and instructed her to walk to Contractor’s Road to insure that no one drove around the barricade. Single-tary then instructed the guard at the Foster-Wheeler gate to expedite the processing of contractors. He then joined Jill Tag-liavore at Contractor’s Road. Shortly thereafter, Bud Hurst returned with the second barricade. Tagliavore, Hurst and Singletary then set up the second barricade: there was no apprehension that they might be injured.
As Singletary, Tagliavore and Hurst stood talking by the tailgate side of the truck, they noticed a pickup truck with a camper speed into the area and pull onto the shoulder of the shell road in front of a car parked across Paris road. A large man then got out of the pickup and proceeded toward the car. The car suddenly backed into the shell area opposite Paris Road. As the man approached the car, it again suddenly moved forward and then backwards erratically. Tagliavore, Hurst and Single-tary felt that a fight was about to begin. Just before the large man reached the car, *563 Singletary noticed that the man inside the car appeared to be holding a camera. A shot suddenly rang out and Singletary heard a thump as the bullet struck Bud Hurst. Singletary and Tagliavore dove behind the truck and ran away down a large ditch. Mr. Hurst had been shot and killed by a striking union member, Aubrey E. Massey. Mr. Massey has subsequently been tried and convicted of second degree murder and sentenced to life imprisonment.
Mr. Hurst’s widow and children brought this suit in tort against Mr. Massey, Albert P. Caldwell, the General Manager of the Tenneco Refinery, William Heck, the Refinery’s Operations Manager, and Jerry Sin-gletary, the Refinery Maintenance Manager. Tenneco Oil Company was also named as a defendant under the theory of respon-deat superior.
Tenneco and the three Refinery Managers filed exceptions asserting that plaintiffs had failed to state a cause of action which would permit tort recovery under Bazley v. Tortorich, 397 So.2d 475 (La.1981). At the time of his death, Mr. Hurst was working within the course and scope of his employment. Under Bazley, plaintiffs would have to show that the Tenneco managers either consciously desired the harm to Mr. Hurst or were substantially certain that harm would result from their actions.
After plaintiffs amended their petition, the trial court granted Tenneco’s exception of no cause of action. This court reversed and remanded to the trial court for further proceedings. 411 So.2d 622.
Plaintiffs subsequently noticed and took the deposition of the trial court judge, Judge McBride. Judge McBride stated that it would be very difficult for plaintiffs to convince him that Caldwell, Heck and Singletary placed Mr. Hurst in a situation in which they knew he would be murdered or seriously injured. Based on these comments, plaintiffs sought and obtained Judge McBride’s recusal. The case was then alloted to Judge David S. Gorbaty.
Tenneco and plaintiffs submitted the matter to Judge Gorbaty on cross motions for summary judgment. Judge Gorbaty rendered judgment in favor of Tenneco Oil Company and its managers. Plaintiffs appealed, and this court reversed, finding there was a dispute of material fact. 533 So.2d 35. The case was remanded for trial on the merits.
Just prior to trial, plaintiffs sought dismissal with prejudice of their claims against Jerry Singletary.
After trial on the merits, Judge Gorbaty ruled in favor of Tenneco Oil Company and the two remaining managers, Caldwell and Heck. Judgment was rendered against Mr. Hurst’s murderer, Audrey Massey, in the total amount of $875,000.00. Plaintiffs appeal.
Plaintiffs complain that 1) the trial court applied the wrong standard; 2) the judgment is contrary to the evidence and they are entitled to judgment in tort against the executive officers of and Tenneco Oil Company as a matter of law; 3) that the amount of the award should be raised to conform to the evidence; and 4) that the judgment should be amended to reflect the correct winning party.
1) Standard of Proof
LSA-R.S. 23:1032 provides in pertinent part:
“The rights and remedies herein granted to an employee or his dependent on account of an injury, or compensable sickness or disease for which he is entitled to compensation under this Chapter, shall be exclusive of all other rights and remedies of such employee, his personal representatives, dependents, or relations, against his employer, or any principal or any officer, director, stockholder, partner or employee of such employer or principal, for said injury, or compensable sickness or disease. For purposes of this Section, ‘principal’ shall be defined as any person who undertakes to execute any work which is a part of his trade, business or occupation in which he was engaged at the time of injury, or which he had contracted to perform and contracts with any person for the execution thereof.
*564 Nothing in this Chapter shall affect the liability of the employer, or any officer, director, stockholder, partner or employee of such employer or principal to a fine or penalty under any other statute or the liability, civil or criminal, resulting from an intentional act.”
The trial judge stated in his Reasons for Judgment that plaintiffs failed to prove that decedent’s death was a result of intentional acts of the defendants. The court noted the standard set forth in Bazley v. Tortorich, 397 So.2d 475 (La. 1981):
“The meaning of ‘intent’ is that the person who acts either (1) consciously desires the physical result of his act, whatever the likelihood of that result happening from his conduct; or (2) knows that that result is substantially certain to follow from his conduct, whatever his desire may be as to that result. Thus, intent has reference to the consequences of an act rather than to the act itself.”
The court found “that the defendants neither desired Hurst’s death nor were substantially certain that his death would result from their actions.” The trial court clearly applied the correct standard under LSA-R.S. 23:1032 and Bazley v. Tortorich, supra. This assignment of error is without merit.
2) Tort Liability
In their second assignment of error, plaintiffs allege that a) the judgment is contrary to the evidence and b) they are entitled to judgment in tort against the executive officers of and Tenneco Oil Company based on the intentional acts of these defendants.
2(a) Judgment not Contrary to the Evidence
Plaintiffs argue that the trial court erroneously relied on defendants’ trial court testimony which is contrary to statements made in affidavits filed in support of Tenneco’s petition for injunction relief filed January 9, 1980. Because the judgment dismissing the executive officers of and Tenneco is based on this testimony, plaintiffs argue, the judgment is contrary to the evidence.
The affidavits filed in support of Tenne-co’s petition for injunction all relate to picket line misconduct on January 8, 1980. This misconduct included shots being fired near the main gate, several of which struck a streetlight and a high-intensity outdoor light, and one of which struck or ricocheted onto the guard house at the main gate; the throwing of rocks at lights and equipment at the Foster-Wheeler gate; scratching of cars with picket signs and damaging of automobile tires by placement of roofing nails on the street; shouting of obscenities at persons and/or jostling and bumping of persons entering or leaving the refinery; and detaining persons entering or leaving the refinery for periods of up to an hour.
At trial, Albert Caldwell testified that there were continuing acts of harassment and intimidation around the picket line area. He acknowledged two incidents in which flares were shot, one over the Tenne-co plant and one into the main telephone cables at St. Bernard Highway and Paris Road.
William Heck testified that he was aware of two incidents of gunfire involving the streetlight and the high-intensity floodlight. He believed that both incidents occurred on the first night of the strike.
Alvin Bordelon, counsel for Tenneco, testified that gunshots had been fired on the first night of the strike. He further acknowledged the shooting of a flare over the Tenneco Refinery.
The conclusions of the trier of fact are entitled to great weight and such findings are not to be disturbed on appeal in the absence of clear and manifest error. After reviewing the record, we find no indication that the trial court judgment is contrary to the evidence or that the testimony contradicts the affidavits admitted into evidence.
2(b) Tort Liability for Intentional Acts
In order to recover in tort, plaintiffs must show that their case falls within the intentional act exception stated in LSA-R.S. 23:1032. As noted, the Supreme Court analysis of this statute under Bazley v. *565 Tortorich, 397 So.2d 475 (La.1981) requires that the person who acts either (1) consciously desires the physical result of his act, whatever the likelihood of that result happening from his conduct; or (2) knows that that result is substantially certain to follow from his conduct, whatever his desire may be as to that result.
Plaintiffs cite Caudle v. Betts, 512 So.2d 389 (La.1987) in support of reversal of the trial court judgment. In Caudle, an employee was harmed by his employer’s chief executive officer when the officer administered an electrical shock behind the employee’s earlobe as a practical joke. The shock resulted in unintended and unforeseeable impairment of the plaintiff’s occipital nerve.
Citing Bazley, supra, the Court noted that in drawing a line between intentional and unintentional acts the legislative aim was to make use of the well established division between intentional torts and negligence. Caudle v. Betts, 512 So.2d 389, 390-91. The Court further stated that when an employee seeks to recover from his employer for an intentional tort, “a court must apply the legal precepts of general tort law related to the particular intentional tort alleged to determine whether he has proved his cause of action.” Id. at 391.
The Court found that the executive officer had committed a battery upon the plaintiff employee. The Court stated:
“A harmful or offensive contact with a person, resulting from an act intended to cause him to suffer such a contact, is a battery. A defendant’s liability for the harm resulting from a battery extends to consequences which the defendant did not intend and could not reasonably have foreseen.”
In the instant case, there is absolutely no evidence that either Tenneco or its executive officers committed an intentional tort upon the decedent.
We find no error in the trial court’s finding that defendants neither desired nor were substantially certain that Hurst’s death would result from their actions. The dismissal of Tenneco Oil Company, Tenne-co, Inc., Albert Caldwell, Jr. and William E. Heck is affirmed.
3) Amount of Award
Plaintiffs were awarded a total of $875,000.00 against Audrey Massey. Of this amount, $400,000.00 was awarded for loss of support. Dr. Melville Z. Wolf son, whose testimony was taken by deposition after trial, calculated the loss of support as $975,000.00. There was no other economic testimony offered into evidence. Plaintiffs claim that in light of this testimony, the trial court erred in awarding only $400,-000.00 for loss of support. We agree. We find that the lowest amount the court could have awarded plaintiffs for loss of support is $547,064.00.
At the time of his death, Mr. Hurst was 51 years old. At that time, he was earning approximately $48,845.00 a year. Assuming Mr. Hurst worked until the age of sixty-five with no increase in salary, he would have earned a total of $683,830.00. The family included three children and Mr. and Mrs. Hurst. Assuming Mr. Hurst would have expended one-fifth of his earnings on himself, we deduct $136,766.00 from $683,830.00 to arrive at the lowest possible award of $547,064.00.
The award for loss of support is increased by $147,064.00.
4) Amendment to Reflect Winning Party
The trial court judgment states that “there be judgment in favor of Catherine Hurst” and the decedent’s children. However, the judgment subsequently refers to Mrs. Hurst as Mrs. Catherine Massey. The judgment is amended to reflect the proper party, Mrs. Catherine Hurst.
For the reasons stated, the judgment is affirmed insofar as it dismisses all claims against Tenneco Oil Company, Tenneco, Inc., Albert Caldwell, Jr. and William E. Heck. The amount of the award for loss of support is increased from $400,000.00 to *566 $547,064.00, the lowest amount the trial court could have awarded in light of the evidence. Finally, the trial court judgment is amended to reflect the name of Catherine Hurst rather than Catherine Massey.
AFFIRMED AS AMENDED.